UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br><br>vs.<br><br><br><br>**JEFFREY HESTER-JACKSON,**<br>Defendant. | **2:22-CR-20507-TGB-JJCG**<br><br><br>HON. TERRENCE G. BERG<br><br><br>**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS THE STATEMENT OF THE DEFENDANT (ECF NO. 177);**<br><br>**EVIDENCE SEIZED FROM THE SEARCH OF VEHICLE (ECF NO. 181);**<br><br>**AND EVIDENCE SEIZED FROM SEARCH WARRANT FOR PREMISES (ECF NO. 183);**<br><br>**AND DENYING DEFENDANT'S MOTION FOR EARLY DISCLOSURE OF JENCKS MATERIALS AND WITNESS LISTS (ECF NO. 178).** |

Defendant Jeffrey Hester-Jackson has been indicted on following counts: (1) Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, 21 U.S.C. §§ 846, 841 (a)(1); (2) Attempted Possession of Fentanyl with Intent to Distribute, 21 U.S.C. §§ 846, 841

1

(a)(1); (3) Possession of Fentanyl with Intent to Distribute, 21 U.S.C. § 841(a)(1); (4) Possession of a Firearm by a Convicted Felon, 18 U.S.C. § 922(g)(1); (5) Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956(h); and (6)–(9) four counts of Money Laundering, 18 U.S.C. § 1957. ECF No. 136. Mr. Hester-Jackson has filed a motion to suppress his statements, ECF No. 177, a motion to suppress the search of a 2022 Dodge Ram, ECF No. 181; ECF No. 184, a motion to suppress evidence gathered as a result of the execution of a search warrant for a premise ("Target Premises 8"), ECF No. 183, and a motion for early disclosure of Jencks materials and witness lists, ECF No. 178.

The Government has filed briefs in opposition. ECF Nos. 198, 200. Mr. Hester-Jackson has not replied. The Court held a hearing on the motion on December 10, 2025. Having carefully considered the briefs and the arguments made at the hearing, the Court will **DENY** the motions to suppress, ECF No. 177, 181, 184, and the motion for early disclosure of Jencks materials and witness lists, ECF No. 178.

## I.  BACKGROUND

### A.  Search Warrant for Target Premises 8

On June 14, 2022, Judge Kimberly G. Altman granted an application for a search warrant, ECF No. 185, PageID.1679, for the premises located at "1556 E Lafayette St. Apt #362, Detroit, Michigan"— Target Premises 8. *Id.* at PageID.1846. The search warrant was supported by a 166-page affidavit sworn to by Special Agent ("SA")

Hillary Genrich. *Id.* at PageID.1845. The Court recounts some of the relevant statements contained in SA Genrich's affidavit below.

In August 2020, agents received information from a "DEA Confidential Source (DEA-1) regarding the drug trafficking activities of Clifford JONES Jr and his associates." *Id.* at PageID.1702–03 (footnote omitted). "The information provided by DEA-1 has been deemed credible and reliable for the purposes of this investigation and the information provided by DEA-1 has been corroborated by other law enforcement investigatory techniques such as database checks and physical identification of suspects using photographs." *Id.* at PageID.1702 n.1. "DEA-1 stated JONES JR and Andre PHARR aka 'CHIP' or 'CHIPPY' are leaders of the [Drug Trafficking Organization ("DTO")]." *Id.* at PageID.1703.

In October 2021,

DEA-1 stated there was an individual he/she knew as Jeff or JAZZY who was moving heroin and/or fentanyl on behalf of the DTO. DEA-1 stated JAZZY had just been released from federal prison and was also associated with the 42 Hustle Boys. Investigators had previously identified JAZZY as HESTER-JACKSON from intercepted jail calls between HESTER-JACKSON and PHARR, who PHARR referred to as JAZZY during the calls. DEA-1 also confirmed JAZZY was HESTER-JACKSON via HESTER-JACKSON's Michigan driver's license picture.

*Id.*

On November 17, 2021, a DEA group "conducted a controlled delivery of a package which had been previously seized by Detroit Postal Inspectors containing over 400 grams of fentanyl pills." *Id.* at PageID.1710. Later, RASHAAN PERKINS was observed picking up the package. *Id.* at PageID.1711. "When law enforcement attempted to stop PERKINS' vehicle, he fled and was in a one-car accident. PERKINS was apprehended after he attempted to flee on foot from the scene of the accident." *Id.* "Three cellphones were seized from PERKINS at the time of his arrest. … On all three of the cellphones, investigators observed messages that appeared to demonstrate PERKINS coordinating various parcel shipments with individuals, including HESTER-JACKSON." *Id.*

"After PERKINS was incarcerated, PERKINS and HESTER-JACKSON spoke on a recorded jail call, where HESTER-JACKSON told PERKINS he was going to 'run business' for PERKINS." *Id.* at PageID.1712.

On April 9, 2022, Hester-Jackson called the United States Post Office regarding a package that was supposedly sent by his grandmother in Arizona. *Id.* at PageID.1715–17. Subsequently, investigators searched the package and seized approximately one kilogram of fentanyl. *Id.* at PageID.1717.

On April 18, 2022, a call between Mr. Hester-Jackson and Cairo Scott was intercepted. *Id.* at PageID.1718. Special Agent Genrich attests that in her interpretation of the call, Mr. Hester-Jackson and Ms. Scott

appeared to make arrangements for Mr. Hester-Jackson to give Ms. Scott "something to fly with (like drugs or drug proceeds)." *Id.* at PageID.1719–20.

On May 24, 2022, "investigators intercepted a series of calls between HESTER-JACKSON and 'DADA' who investigators identified as Anthony WASHINGTON. Investigators believe HESTER-JACKSON and WASHINGTON were talking about how to launder bulk currency." *Id.* at PageID.1730–31.

On May 25, 2022, investigators intercepted a call between Mr. Hester-Jackson and Gabrielle Thomas. *Id.* at PageID.1736. Agent Genrich attests that in her interpretation of the call, Ms. Thomas was flying on behalf of Mr. Hester-Jackson to Phoenix, Arizona, "to send bulk currency back to [the DTO's] source of supply." *Id.* at PageID.1735–36. Ms. Thomas was later searched and found with $51,000. *Id.* at PageID.1737.

During the investigation, "investigators became aware that HESTER-JACKSON moved apartments from the River Place Apartments: 500 River Place Drive Unit #5315, Detroit, Michigan to 1556 E Lafayette Unit #362, Detroit, Michigan - TARGET PREMISES 8 … in late May of 2022." *Id.* at PageID.1787–88. Investigators noticed that he would frequently stay overnight at Target Premises 8. *Id.* at PageID.1788. An intercepted phone conversation reflected that while the apartment and the utilities were in the name of another individual,

Damia Doss, Mr. Hester-Jackson was paying for the apartment. *Id.* at PageID.1788–90. Specifically, on the phone call, Mr. Hester-Jackson told Ms. Ross, "I'm payin' it." *Id.* at Page.1788. Later, Ms. Ross informs Mr. Hester-Jackson, "all my stuff is moved," and Mr. Hester-Jackson responds "So, I can move in tonight?" *Id.* at PageID.1789. Agent Genrich attests that Ms. Doss had previously established another apartment for Hester-Jackson. *Id.* at PageID1789–90. Genrich also attests that she "know[s] it is common for drug traffickers to use nominees, or another individual's personal information, for things such as utility information, phone subscriber information, etc. to avoid law enforcement detection." *Id.* at PageID.1790.

On May 26, 2022, investigators intercepted a call between Mr. Hester-Jackson and Paula Drew. *Id.* at PageID.1790–92. On the phone call, Mr. Hester-Jackson informed Ms. Drew that the number she was calling was for his "house phone" that he was now using "[a]t home" and that "nobody call this one no more." *Id.* at PageID.1791. Then, Mr. Hester-Jackson informed Ms. Drew that he had a new phone number— which investigators identified as the HESTER-JACKSON PHONE 2. *Id.* at PageID.1791. Agent Genrich attests that

> Because investigators know from interceptions that HESTER-JACKSON utilizes his cellular device(s) in furtherance of drug trafficking, investigators believe TARGET PREMISES 8 will contain those cellular device(s) that contain evidence of HESTER-JACKSON's drug trafficking activities. As I have stated above, I know it is

6

> common for drug traffickers to store drug proceeds, assets purchased by drug proceeds, and other important documents pertaining to drug and/or money laundering activities at trusted locations. TARGET PREMISES 8 is where HESTER-JACKSON spends most of his nights, since he has moved in, so investigators believe TARGET PREMISES 8 is considered one of those trusted locations. In addition, I know people often keep their cellular device(s) with them and because HESTER-JACKSON spends most nights at TARGET PREMISES 8, I believe TARGET PREMISES 8 will contain HESTER-JACKSON's cellular devices as well as additional evidence of his drug trafficking activities.

Id. at PageID.1793.

Judge Altman found that the affidavit established probable cause to search Target Premises 8. *Id.* at PageID.1850. The search warrant provided that

> The search of TARGET PREMISES 8, shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, phones, trash cans, electronic storage devices and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises.

*Id.* at PageID.1846. The search warrant provided for a list of items to be seized. *Id.* at PageID.1847. These items include:

- "Documents relating to or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances."
- "Articles of personal property relating to the existence of a conspiracy to import, possess and distribute controlled substances."
- "Articles of personal property relating to the obtaining, secreting, transferring, expenditure and concealment of United States

currency or foreign currency, as well as assets derived from or to be used in the importation and/or sale of controlled substances."

- "Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records."
- "Computers."
- "Cellular Telephones."
- "Financial proceeds and articles of personal property relating to the sale of controlled substances."
- "Records or documents pertaining to domestic and international travel."
- "Records or documents pertaining to postal and private package delivery services."
- "Equipment to detect police activities and surveillance."
- "Firearms and ammunition."
- "Photographs of individuals importing, possession, distributing or manufacturing controlled substances."
- "Documents and articles of personal property relating to the identity of the persons occupying, possessing, residing in, owning, frequenting or controlling the TARGET PREMISES to be searched or property therein."

*Id.* at PageID.1847–49

## B.   Search of Target Premises 8

On June 16, 2022, DEA Detroit Task Force Group executed the warrant. ECF No. 199-1, PageID.1930. A Report of Investigation (the "Report") prepared on that date by Task Force Officer ("TFO") George Hall reported following details:

After "law enforcement personnel approached the residence to execute the search warrant," TFO Hall

8

knocked on the door and announced loudly the presence of police multiple times. After waiting a reasonable amount of time, TFO Hall used a key to the residence to open the door and the entry team entered to conduct a security sweep of the residence. Upon entry into the residence, Jeffrey HESTER-JACKSON was observed standing in the kitchen. HESTER-JACKSON was detained for his safety without incident while agents continued the security sweep of the residence. HESTER-JACKSON was the only occupant of the residence.

*Id.* at PageID.1931.

During the execution of the search warrant, Group Supervisor ("GS") J. Derek Ress "located Dodge Ram keys on the couch, which HESTER-JACKSON identified as his 'loaner' vehicle from the dealership while his leased Dodge Ram TRX was being fixed." *Id.* at PageID.1932.

The Report describes the search of a 2022 Dodge Ram with Michigan license plate "SIMPL57," although the Report does not contain details on where the vehicle was located, and how it was identified as the vehicle associated with the keys found on the couch. *Id.* During the search of the vehicle,

GS Ress located a black Glock 23 .40 caliber handgun … underneath the front passenger seat. The Glock was brought into the residence where TFO Hall rendered it safe. The handgun was loaded with an extended magazine containing 15 rounds of ammunition and 1 round of ammunition in the chamber, for a total of 16 rounds of .40 caliber ammunition.

*Id.* at PageID.1933.

During the execution of the search warrant,

TFO Hall sat at the kitchen table with HESTER-JACKSON. TFO Hall explained the search warrant to HESTER-

9

JACKSON and what it encompassed. HESTER-JACKSON was cooperative and not argumentative. HESTER-JACKSON asked for details about the case, however, TFO Hall told him he'd be advised of the details and interviewed once he was taken to the DEA Detroit Division Office.

*Id.* In his motion to suppress, Mr. Hester-Jackson argues that "he was handcuffed and was detained in such a fashion that any reasonable person would not feel free to leave." ECF No. 177, PageID.1592.

According to the report, Mr. Hester-Jackson made several statements while seated at the table, including the following:

- That he was the sole occupant of the residence, but the name on the apartment lease was Damia DOSS. HESTER-JACKSON stated DOSS has a good credit history and he does not, so DOSS rents residences in her name for other people.
- That he had lived at the apartment for several weeks.
- That he was sleeping in the southwest bedroom (herein referred to as the master bedroom) when agents knocked on his door.
- That he leases a Dodge Ram TRX, but it was in the shop. HESTER-JACKSON advised he currently had a "loaner" Dodge Ram pickup from the dealership that was parked outside of the complex on Lafayette St. and he was the primary driver of the vehicle.
- That his girlfriend is Araina FLOWERS.
- HESTER-JACKSON referred to Dion HAYES aka 42 Dugg as his "cousin" when mail with HAYES' name on it was found in the residence.
- That the red iPhone and black iPhone found in the master bedroom were his and currently active.
- When GS Ress walked into the apartment holding the Glock 23 handgun that he (GS Ress) found in the "loaner" Dodge Ram, HESTER-JACKSON's demeanor immediately changed. HESTER-JACKSON sat up in his chair and began visibly sweating, whereas before he was relaxed and calm. HESTER-

10

JACKSON was not questioned about the handgun, but continued to talk about it voluntarily, advising he did not know about it and someone must have put it there.

ECF No. 199-1, PageID.1933.

## C.  Evidentiary Hearing

On December 10, 2025, the Court held an evidentiary hearing. At the hearing, the Government called two witnesses: Sergeant George Hall and Assistant Special Agent in Charge Jonathan Derek Ress.[1]

As relevant here, TFO Hall testified as to following information:

At a pre-raid briefing held prior to the execution of the June 16, 2022 search warrant of Target Premises 8, officers were instructed that if they were to come into contact with Mr. Hester-Jackson during the execution of the warrant, Mr. Hester-Jackson would be detained and later interviewed at the division office. TFO Hall would not be the officer interviewing Mr. Hester-Jackson at the division office.

TFO Hall's role during the execution of the search warrant was to perform a "return and tabulation," in which he would document anything that was seized and removed from the Target Premises 8. During that process, officers photograph the seized evidence and document the item and which officer found it.

_____

[1] As neither party requested a transcript, the Court here summarizes the testimony based on reviewing a rough transcript, as well as its memory of the testimony.

The June 16, 2022 search warrant of Target Premises 8 was executed by a total of eleven officers and one narcotics-trained canine.

When officers entered Target Premises 8, Mr. Hester-Jackson was standing in the kitchen. Mr. Hester-Jackson was ultimately handcuffed and placed in a chair at a circular table in the corner of the living room. While the search warrant was executed, TFO Hall was sitting directly across from Mr. Hester-Jackson at the same table.

When TFO Hall joined Mr. Hester-Jackson at the table, he explained what the search warrant was, what it encompassed, and that he would be interviewed later. Specifically, TFO Hall testified that he informed Mr. Hester-Jackson that he would be taken to a separate location where he would be interviewed. The only questions the agents addressed to him were certain background questions, such as his name and date of birth, that are routinely asked during the execution of a search warrant. But, without further questioning by the agents, Mr. Hester-Jackson continued to talk, making comments now and then in reaction to seeing the items of evidence that TFO Hall was receiving for documentation.

TFO Hall testified that after the initial background questions, he did not ask Mr. Hester-Jackson any further questions. Instead, when another officer would present TFO Hall with a seized item, Mr. Hester-Jackson would make unsolicited comments.

Throughout his testimony, TFO Hall reaffirmed that he did not ask Mr. Hester-Jackson any questions, even in response to Mr. Hester-Jackson's unsolicited comments.

TFO Hall testified that Group Supervisor Derek Ress found the keys to the Dodge RAM truck. TFO Hall testified that when Mr. Ress commented on having found the keys, Mr. Hester-Jackson offered, unsolicited, that the keys were for a loaner vehicle that Mr. Hester-Jackson was using while his was in the shop. TFO Hall reaffirmed, upon questioning, that did not ask Mr. Hester-Jackson any questions about the loaner.

TFO Hall testified that throughout the execution of the search warrant, Mr. Hester-Jackson would make unsolicited comments about evidence that officers were seizing.

When Mr. Ress returned with a firearm from his search of the vehicle, Mr. Hester-Jackson almost immediately sat up and began sweating. TFO Hall reaffirmed that he did not ask Mr. Hester-Jackson any questions. Without being asked any questions, Mr. Hester-Jackson stated that the gun was not his and that somebody must have put it there.

TFO Hall also testified that he twice informed Mr. Hester-Jackson that he did not have to keep talking. TFO Hall testified that he took *Miranda* seriously and always wanted to make sure that individuals

understood that they were not being interrogated and that speaking further would hurt them.

TFO Hall testified that after the conclusion of the search warrant, he transported Mr. Hester-Jackson to the DEA field division office.

During cross-examination, TFO Hall testified that he did not read Mr. Hester-Jackson his *Miranda* warnings. TFO Hall further testified that he did not tell Mr. Hester-Jackson that if Mr. Hester-Jackson were to say something, it would be used against him.

TFO Hall also testified that it would have been unsafe to place Mr. Hester-Jackson at a location in the residence that was more isolated from TFO Hall and the other officers.

TFO Hall also testified that Mr. Hester-Jackson could have been placed in a chair in a corner, along with another officer, without observing the evidence that TFO Hall was documenting.

When asked whether TFO Hall considered that having Mr. Hester-Jackson sit in front of TFO Hall was "meant to elicit a response," TFO Hall testified that he never considered this. TFO Hall testified that it was not his purpose to elicit a response from Mr. Hester-Jackson.

TFO Hall testified that he had done close to fifty search warrants and that individuals are "often kept within the residence for safety concerns and so that they can witness items being seized and … sign for." TFO Hall originally stated that individuals would "have to sign for" high

value items but later clarified that they were given a choice to sign such documentation.

TFO Hall testified that if Mr. Hester-Jackson wished to get up and use the restroom, he would have had to ask and get permission. TFO Hall further testified that someone would have to accompany Mr. Hester-Jackson to the restroom. TFO Hall acknowledged that Mr. Hester-Jackson's freedom of movement was restricted and that Mr. Hester-Jackson would not have been able to leave the apartment. TFO Hall acknowledged that Mr. Hester-Jackson was under arrest during the execution of the search warrant.

The search of the Target Premises 8 took about an hour and a half.

TFO Hall testified that during the execution of the search warrant, it was his job to document the items that were seized. Accordingly, TFO Hall would routinely get up and take pictures before returning to the table at which Mr. Hester-Jackson was seated. TFO Hall testified that he could not tell whether Mr. Hester-Jackson was paying attention to him at this time. TFO Hall acknowledged that he would occasionally look at Mr. Hester-Jackson.

When asked whether it was "a set up so that you could bring evidence in front of [Mr. Hester-Jackson] so that he could see it and then respond," TFO Hall testified, "No." When asked whether he had "discuss[ed] doing that before [he] went for the search warrant," TFO Hall testified, "I would never."

15

TFO Hall testified that he was paying attention to Mr. Hester-Jackson to make sure he was okay. TFO Hall testified that he had an opportunity to observe what Mr. Hester-Jackson's response was when items were brought out in front of him.

TFO Hall testified that the voluntary statements made by Mr. Hester-Jackson occurred throughout the execution of the search warrant.

On re-direct, TFO Hall explained that there were multiple reasons why Mr. Hester-Jackson was seated across from him during the execution of the search warrant: to keep multiple eyes on Mr. Hester-Jackson, to observe the high-value items that were being seized, and because the available police vehicle where Mr. Hester-Jackson could have be placed was not suitable for prisoner transport.

Upon questioning by the Court, TFO Hall testified that at the outset of the execution of the search warrant he informed Mr. Hester-Jackson as follows:

- TFO Hall explained the search warrant; why the officers were there; who the officers were there for; and what the officers were looking for;
- TFO Hall explained follow-up steps;
- That Mr. Hester-Jackson would be questioned later;
- That Mr. Hester-Jackson was not under *Miranda* and that he did not need to keep talking;
- That anything Mr. Hester-Jackson said would be used against him, that he doesn't need to talk or acknowledge anything, that he wasn't being asked any questions;

When the Court asked TFO Hall whether he acted intentionally to elicit a response, TFO Hall testified that he would never do that and that he did not do that.

Next, the Government called Assistant Special Agent in Charge Jonathan Derek Ress. At the time of the search warrant, Ress was the Group Supervisor of the task force group that executed the warrant. As relevant here, GS Ress testified as to following information:

GS Ress attended the meeting prior to the execution of the search warrant. GS Ress testified that it was his understanding that Mr. Hester-Jackson, if he was found, was to be taken downtown to be interviewed. During the execution of the search warrant of Target Premises 8, TFO Hall's role was to gather and photograph the evidence.

Mr. Hester-Jackson and TFO Hall were seated at the same table. TFO Hall was processing evidence at that table.

When GS Ress found the car keys on the couch, he "held them over towards [TFO] Hall and … said 'I found some car keys.'" At that point, Mr. Hester-Jackson voluntarily stated that the keys belonged to his loaner vehicle which was out front. GS Ress testified that neither he nor TFO Hall asked Mr. Hester-Jackson about the location of the vehicle.

GS Ress testified that Mr. Hester-Jackson was very talkative throughout the execution of the search warrant. Specifically, Mr. Hester-Jackson "was asking a lot of questions [and] volunteering information. Nobody was talking to him. He would just make a lot of comments."

17

GS Ress testified that TFO Hall did not direct any comments or questions towards Mr. Hester-Jackson.

GS Ress testified that he could recall two occasions when TFO Hall told Mr. Hester-Jackson that he was going to be interviewed later and that Mr. Hester-Jackson needed to stop talking.

GS Ress testified that the vehicle was parked immediately in front of the apartment complex containing Target Premises 8. GS Ress found a firearm in the vehicle and brought it back to Target Premises 8 and handed it to TFO Hall to document it as evidence. Neither GS Ress nor TFO Hall asked Mr. Hester-Jackson any questions about the firearm. GS Ress testified that when he returned to the residence with the firearm, that Mr. Hester-Jackson sat straight up and acted agitated. GS Ress also testified that Mr. Hester-Jackson stated that the firearm was not his, and that somebody must have put it there. On re-direct, GS Ress testified that the vehicle was parked in a public parking lane.

## II. LEGAL STANDARD

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014), *as amended* (Oct. 21, 2014) (citation omitted). The defendant bears both "the burden of production and persuasion." *Id.* (citation omitted).

18

## III. DISCUSSION

Mr. Hester-Jackson has filed a motion to suppress his statements, ECF No. 177, a motion to suppress the search of a 2022 Dodge Ram, ECF No. 181; ECF No. 184, a motion to suppress evidence gathered as a result of the execution of a search warrant for Target Premises 8, ECF No. 183, and a motion for early disclosure of Jencks materials and witness lists, ECF No. 178. The Court addresses these motions in turn.

### A. Statements of Defendant

Mr. Hester-Jackson argues that the statements that were made during the execution of the search warrant should be suppressed. ECF No. 177, PageID.1592. Specifically, Mr. Hester-Jackson argues that while "the Defendant's freedom of movement was clearly restricted" and "[a]lthough the Defendant was clearly a target of the investigation, he entered into a dialogue with the agents on incriminating details of the case" without being Mirandized. *Id.* at PageID.1592. Mr. Hester-Jackson appears to refer to the statements he made to TFO Hall while Mr. Hester-Jackson was seated at the kitchen table.

In response, the Government argued that

[t]he officers did not provide Hester-Jackson *Miranda* warnings, because the officers did not intend to interrogate Hester-Jackson. … At most, TFO Hall only asked Hester-Jackson basic identification questions for the booking process. … After TFO Hall explained the search warrant and what it encompassed, Hester-Jackson sought more details about the case. TFO Hall's response was that he would be "advised of the details and interviewed once he was taken to the DEA

> Detroit Division office." Hester-Jackson's demeanor was
> cooperative. His statements, not at as a result of any
> questioning by TFO Hall, are voluntary and admissible.

ECF No. 198, PageID.1921 (citations omitted).

The Fifth Amendment dictates that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To the ends of protecting that right, *Miranda* requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating individuals whom the officers have placed 'in custody,'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citation omitted), or "subjected to a custodial interrogation," *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997) (cleaned up).

> Any questioning that occurs after a defendant's liberty has
> been significantly restrained triggers the duty to warn. *Id.*
> The duty arises whenever there is "express questioning or its
> functional equivalent." However, where a defendant makes a
> voluntary statement without being questioned or pressured
> by an interrogator, the statements are admissible despite the
> absence of *Miranda* warnings.

*Id.* (citations omitted). In other words, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

Here, Mr. Hester-Jackson was clearly in custody while he was seated at the kitchen table: Mr. Hester-Jackson was handcuffed, not free to leave, and, according to TFO Hall, under arrest. In any case, the

Government appears to concede this point. Thus, the Court must examine whether Mr. Hester-Jackson was subjected to "express questioning or its functional equivalent." *Id.*

Under *Miranda*, "the term 'interrogation' … refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. Thus,

> A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 301–02.

In *Smith*, the Sixth Circuit was confronted with following circumstances: during the execution of a search warrant, one of the officers "discovered a .357 Magnum revolver with five live rounds on the couch underneath a shirt." *Smith v. United States*, 285 F. App'x 209, 211 (6th Cir. 2008). The officer informed one of the residents of the discovery of the weapon. *Id.* The defendant, Smith, in response to seeing the recovery of the gun," made certain statements that were introduced at trial. *Id.*

21

The Sixth Circuit found that the defendant's "alleged statement was not made in response to the functional equivalent of an interrogation." *Id.* at 214. The Sixth Circuit found that

> Smith's statement was made in response to the mere discovery of the weapon. In fact, according to the testimony at trial, Smith's statement was not made in response to any questioning whatsoever. Thus, the conditions under which Smith allegedly made her statement were far from those "the police should know are reasonably likely to elicit an incriminating response," but instead were simply those "normally attendant to arrest and custody."

*Id.* (citations omitted).

In *Sharp*, a district court applied *Smith* to a circumstance in which a weapon discovered during execution of the search warrant was placed in front of the defendant while he was seated at the kitchen table. *United States v. Sharp*, 680 F. Supp. 2d 895, 900 (E.D. Tenn. 2010). The district court found that, even though "the weapon was *placed* in the Defendant's purview after it was discovered, … the defendant responded to the 'mere discovery' of the weapon under the circumstances 'normally attendant to arrest and custody.'" *Id.* at 921 (emphasis added, citations removed).

The Court finds that Mr. Hester-Jackson was not subjected to express questioning or its functional equivalent. The Court also finds that the officers executing the search warrant of Target Premises 8 did not engage in any practices that the officers should have known were

reasonably likely to evoke an incriminating response from Mr. Hester-Jackson.

First, TFO Hall and GS Ress testified that Mr. Hester-Jackson was not asked any questions throughout the execution of the search warrant, beyond the initial questions regarding his identity. TFO Hall also testified that he did not direct any comments to Mr. Hester-Jackson intended to elicit an incriminating response.

Second, TFO Hall and GS Ress testified that throughout the interview, Mr. Hester-Jackson freely volunteered information, without being prompted by the officers. Additionally, TFO Hall and GS Ress testified that when GS Ress returned from his search of the vehicle with the firearm he had found, Mr. Hester-Jackson began perspiring and changing his posture.

Third, TFO Hall and GS Ress testified that TFO Hall informed Mr. Hester-Jackson on multiple occasions, including at the outset, that he did not need to answer any questions,  and that he would be interviewed later at the police station. Additionally, both officers testified that TFO Hall informed Mr. Hester-Jackson that he needed to stop talking. TFO Hall also testified that he told Mr. Hester-Jackson that he was not under *Miranda*, that anything he said would be used against him, and that he wasn't being asked any questions.

Fourth, TFO Hall testified that the practice of presenting evidence in front of the resident of the premises being searched was a typical

procedure with a legitimate justification: inventorying seized items in front of the resident increased trust (in the sense that the property owner would be aware of any items that were being seized). TFO Hall also testified that seating Mr. Hester-Jackson in front of him enhanced safety. TFO Hall testified that he would never act intentionally to elicit a response.

Thus, the Court finds that Mr. Hester-Jackson's comments were "made in response to the mere discovery of," *Smith*, 285 F. App'x at 214 (citations omitted), items. "In fact, according to the testimony" of the officers, Mr. Hester-Jackson's statements were "not made in response to any questioning whatsoever. Thus, the conditions under which [Mr. Hester-Jackson] allegedly made [his] statement were far from those the police should know are reasonably likely to elicit an incriminating response but instead were simply those normally attendant to arrest and custody." *Id.* (cleaned up).

Accordingly, Mr. Hester-Jackson's motion to suppress his statements during the execution of the search warrant of Target Premises 8 is **DENIED**.

## B. Search of Vehicle

Mr. Hester-Jackson seeks to suppress the evidence obtained as a result of the search of the 2022 Dodge Ram during the execution of the search warrant for Target Premises 8. ECF No. 181. Originally, Mr. Hester-Jackson argued that

> [t]he search warrant did not include the Defendant's vehicle, nor did it include the curtilage of the apartment. The vehicle was not in an adjacent garage on the premises of the complex. It was parked in the street. The Defendant was not in or near the car. There was sufficient time to get a warrant since the Defendant was detained and then taken downtown. The vehicle was never taken, nor was it the subject of the inventory search.

*Id.* at PageID.1621.

After filing this motion, Mr. Hester-Jackson filed an "Errata Sheet." ECF No. 184. In that document, Mr. Hester-Jackson concedes that the June 14, 2022 search warrant for Target Premises 8 did have a provision for the search of the curtilage. *Id.* at PageID.1674.

Indeed, the search warrant for Target Premises 8 provides that "[t]he search of TARGET PREMISES 8, shall include all … vehicles located on or near the premises, that are owned or under the control of the occupants of such premises." ECF No. 185, PageID.1846.

Here, during the execution of the search warrant, GS Ress "located Dodge Ram keys on the couch." ECF No. 199-1, PageID.1932. During the evidentiary hearing, GS Ress testified that the vehicle was located directly in front of the apartment complex containing Target Premises 8. TFO Hall and GS Ress both testified that Mr. Hester-Jackson claimed that the keys belonged to a vehicle he was loaning.

In view of the fact that Mr. Hester-Jackson's argument that "[t]he search warrant did not include the Defendant's vehicle, nor did it include the curtilage of the apartment" ECF No. 181, PageID.1621, was

abandoned in his Errata Sheet and controverted by the plain text of the search warrant, it is not entirely clear what the nature of Mr. Hester-Jackson's objection, at this point, is to the lawfulness of the search of the vehicle and seizure of the firearm.

Based on the evidence adduced at the hearing and in consideration of the relevant case law, however, the Court **DENIES** Mr. Hester-Jackson's motion seeking suppression of the evidence obtained as a result of the search of the 2022 Dodge Ram.

First, the text of the search warrant was not overly broad.

The Sixth Circuit employs

> a two-part test for determining whether a description in a warrant is sufficient to satisfy the particularity requirement: (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched.

*United States v. Dobbins*, 482 F. App'x 35, 39 (6th Cir. 2012) (citation omitted). For instance, in *United States v. Pierce*, 574 F. Supp. 3d 449 (E.D. Mich. 2021) (Berg, J.), the undersigned found that a warrant that authorized officers to "search 'any and all persons present or that arrive during the execution of this search warrant, including their extremities, clothing, and *vehicles*," *Id.* at 456 (alteration in original)—when read to allow the search of any present or arriving person's vehicle—was "defective for overbreadth because it would permit a search of a 'present'

26

person's vehicle, wherever that vehicle may be." *Id*. The undersigned reasoned that

> such an unbounded authorization—to search a vehicle anywhere—clearly offers no guidance to limit the discretion of the executing officers. That kind of interpretation could theoretically permit the officers to search a visiting neighbor's car that was then parked at the airport. Such a reading divorces the justification for the search—probable cause to believe that drugs would be at the house—from the place where the search is being authorized: a car located anywhere that happened to belong to someone who is present at the house.

*Id*.

Here, the search warrant authorized the search of "all … vehicles located on or near the premises, that are owned or under the control of the occupants of such premises." ECF No. 185, PageID.1846. This description is of "sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort" and there is not a "reasonable probability that some other premises may be mistakenly searched." *Dobbins*, 482 F. App'x at 39 (citations omitted). Unlike the search warrant discussed in *Pierce*, the search warrant creates clear boundaries for the authorization of the search—the vehicle must be located on or directly adjacent to the premises—and thereby offers clear guidance on the limit of the discretion of the executing officers.

Second, the officers who searched the 2022 Dodge Ram did not exceed the scope of the warrant. The warrant permitted a search of a vehicle if it (1) was located on or near Target Premises 8 and (2) is owned or under the control of the occupants of Target Premises 8. According to GS Ress's testimony, the 2022 Dodge Ram was located directly in front of the apartment complex containing Target Premises 8. Thus, the 2022 Dodge Ram was located near Target Premises 8. Additionally, Mr. Hester-Jackson volunteered that he lived in Target Premises 8 and was temporarily using the 2022 Dodge Ram as a loaner. Thus, the 2022 Dodge Ram was under the control of an occupant of Target Premises 8. Here, the justification for the search, probable cause for the presence of drug-related records at the residence, remains connected to the place where the warrant is authorized.

In light of the Court's finding that the officers who searched the 2022 Dodge Ram did not exceed the scope of the warrant, the Court need not examine whether the public lane in which the 2022 Dodge Ram was parked was part of the curtilage of Target Premises 8.

Accordingly, Mr. Hester-Jackson's motion to suppress the evidence obtained as a result of the search of the 2022 Dodge Ram is **DENIED**.

## C.  Search Warrant for Target Premises 8

Mr. Hester-Jackson seeks to suppress the evidence obtained as a result of the execution of the search warrant for Target Premises 8. ECF No. 183. Mr. Hester-Jackson argues that "within the four corners of the

28

warrant, there was insufficient information to conclude there was a fair probability that evidence of a crime would be found at the Target Premises 8." ECF No. 183, PageID.1662. He thus challenges whether the affidavit set forth sufficient probable cause to support the search warrant.

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To establish probable cause, officers must establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Put another way, there must be a "nexus" between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). "[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016). "If the affidavit does not present sufficient facts demonstrating why the police officer expects to find evidence in the residence rather than in some other place, a judge may not find probable cause to issue a search warrant." *Id.*

In assessing the sufficiency of an affidavit supporting a warrant, the Court looks to the four corners of the warrant; information known to an officer but not conveyed to the warrant-issuing judge is irrelevant.

*United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). To encourage use of the warrant procedure, a magistrate judge's probable-cause determination is afforded "great deference" and should be reversed only if the issuing judge arbitrarily exercised his discretion. *Gates*, 462 U.S. at 236 (internal quotations omitted); *see also United States v. Baker*, 976 F.3d 636, 646 (6th Cir. 2020) (recognizing courts' obligations to give issuing judges the benefit of the doubt in "doubtful or marginal cases").

Addressing a search warrant for the residence of a "known drug dealer," the Sixth Circuit has "acknowledged that in the case of drug dealers, evidence is likely to be found where the dealers live." *Brown*, 828 F.3d at 383 (cleaned up). However, "the critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Id.* at 384. Thus, "a suspect's status as a drug dealer, standing alone," does not give "rise to a fair probability that drugs will be found in his home." *Id.* at 383 (citations omitted). Instead, the Sixth Circuit requires "some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence." *Id.* In other words, the Sixth Circuit has "required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence." *Id.*

Thus,

> [a]lthough a defendant's status as a drug dealer, standing alone, does not give rise to a fair probability that drugs will be found in defendant's home, there is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home.

*United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) (citation omitted).

Mr. Hester-Jackson argues that the warrant lacks probable cause because

> [t]here is no evidence of a controlled buy at or near the residence, nor is there any objective fact that evidence of any crimes was ever seen or committed in his brief time at that residence. The Affidavit merely summarizes that the basis for the warrant is that Target Premises 8 was utilized by Hester-Jackson as his current residence and that it was the belief of the agent, without more, to be safekeeping and storage of drug proceeds.

*Id.* at PageID.1660.

In response, the Government argues that "the affidavit clearly established a fair probability that the DTO engaged in narcotics trafficking and money laundering and that Hester-Jackson was an active member of the DTO," and that "the affidavit established a fair probability that Hester-Jackson's cellular devices would contain evidence of drug trafficking activities by showing trafficking related communications." ECF No. 198, PageID.1913. Further, the Government argues that "[t]he nexus issue is not whether the affidavit established sufficient evidence that there was evidence of drugs or drug dealing at Target Premises 8,

31

but rather between the evidence sought—Hester-Jackson's cellular device(s)—and the place to be searched, his home." *Id.* at PageID.1913–14. For example, the Government points out that the affidavit contains sufficient evidence of a nexus between Mr. Hester-Jackson's phone and Target Premises 8 because of the calls between Ms. Doss and Mr. Hester-Jackson—on which Mr. Hester-Jackson appears to acknowledge that he pays for the apartment and intends to move in shortly—and between Ms. Drew and Mr. Hester-Jackson—on which Mr. Hester-Jackson explains that he was using the phone as his "house phone" that he was now using "[a]t home." *Id.* at PageID.1915. Both of these calls showed that Mr. Hester-Jackson appeared to be using the subject cell phone at the residence to be searched, in turn establishing probable cause to search the residence for that phone.

Here, the affidavit provided sufficient information connecting Mr. Hester-Jackson's participation in the DTO to Target Premises 8 by stating that:

- Mr. Hester-Jackson actively participated in a DTO that engaged in narcotics trafficking and money laundering. For instance, Mr. Perkins and Mr. Hester-Jackson coordinated the shipment of fentanyl. ECF No. 185, PageID.1710–12.
- Mr. Hester-Jackson resided at the Target Premises 8. Specifically, an intercepted phone conversation between Ms. Doss and Mr. Hester-Jackson occurred where Mr. Hester-Jackson appeared to acknowledge that he pays for the apartment and intends to move in shortly. *Id.* at PageID.1787–88.
- Mr. Hester-Jackson's cell phones were connected to criminal activity. For instance, there were multiple intercepted phone calls

between Mr. Hester-Jackson and Mr. Washington about how to launder bulk currency. *Id.* at PageID.1730–31.

- There was "a fair probability that … evidence of a crime"—here, the cell phones of Mr. Hester-Jackson "will be found," *Gates*, 462 U.S. at 238, at Target Premises 8. Specifically, there was an intercepted phone conversation where Mr. Hester-Jackson informed Ms. Drew that the cell phone which was being monitored was his "house phone" that he was now using "[a]t home." *Id.* at PageID.1791. It is reasonable to conclude that Mr. Hester-Jackson was referring to his primary residence, Target Premises 8, as his home.

Thus, the affidavit establishes sufficient facts to establish a proper nexus between the evidence to be seized—such as the cell phone— and Target Premises 8.

While it is true that an individual's identity as a drug dealer, by itself, is not enough to establish the nexus necessary to authorize a search of his home for narcotics evidence, *see Brown*, 828 F.3d at 383, here, the affidavit goes beyond relying exclusively on Mr. Hester-Jackson's status as a drug dealer. Instead, the affidavit specifically establishes that Mr. Hester-Jackson mentioned that a cell phone—one clearly used in the commission of crime—would be in his home, Target Premises 8. No more is needed under *Brown* and its progeny.

Accordingly, Mr. Hester-Jackson's motion to suppress the evidence obtained as a result of the execution of the search warrant for Target Premises 8 is **DENIED**.

**D.  Motion for Early Disclosure of *Jencks* Material**

Lastly, Mr. Hester-Jackson "moves this Honorable Court to allow early *Jencks* disclosure and Witness Lists, 30 days in advance of trial." ECF No. 178, PageID.1596. In his motion, Mr. Hester-Jackson acknowledges that "Federal Rules of Criminal Procedure and the Jencks Act (18 U.S.C. § 3500) itself do not provide for the early disclosure of witnesses' statements." *Id.* at PageID.1598. Nonetheless, "counsel requests this Honorable Court's discretion, in the interests of efficiency and justice, to allow sufficient time for the defense to prepare and avoid trial by ambush." *Id.*

The Government responds that it "is cognizant of the Court's practice guidelines encouraging early disclosure and will endeavor to do so. Similarly, in regard to the defendant's request for an early witness list, the government will provide one to the defense when it provides one to the Court." ECF No. 200, PageID.1943.

With regard to Mr. Hester-Jackson's motion for early disclosure of *Jencks* Act material, under 18 U.S.C. § 3500 (the "*Jencks* Act"), "the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified" "[a]fter a witness called by the United States has testified on direct examination." 18 U.S.C. § 3500(b). Additionally, "the government may not be compelled to disclose *Jencks* Act material before

trial." *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988). Thus, the Court rejects Mr. Hester-Jackson's motion for early disclosure of *Jencks* Act material.

With regard to Mr. Hester-Jackson's motion for early disclosure of the witness list, "a defendant is not entitled to a list of the names and addresses of the government's witnesses." *United States v. Davis*, 306 F.3d 398, 420 (6th Cir. 2002) (citations omitted). However, "the district court has discretion to order the prosecution to produce it." *United States v. Kendricks*, 623 F.2d 1165, 1168 (6th Cir. 1980); *accord United States v. Powell*, No. 12-20246, 2012 WL 6096600, at *6 (E.D. Mich. Dec. 7, 2012) (Goldsmith, J.).

"As a general matter, courts weigh the interests of a defendant in receiving the witness list against the government's countervailing interest in keeping the witness information undisclosed." *Powell*, 2012 WL 6096600, at *6. Here, Mr. Hester-Jackson has provided no compelling reasons why compelling the Government to provide a witness list is necessary at this point. Nor has Mr. Hester-Jackson made a compelling argument that his interests in receiving a witness list at this juncture outweighs the Government's countervailing interest in keeping the information undisclosed. Additionally, the Government has expressed that it will "endeavor" to follow the "Court's practice guidelines encouraging early disclosure." ECF No. 200, PageID.1943. Accordingly,

the Court sees no compelling reason to compel the Government to provide a witness list at this point.

Accordingly, Mr. Hester-Jackson's motion for "early *Jencks* disclosure and Witness Lists, 30 days in advance of trial," ECF No. 178, PageID.1596, is denied.

## IV.  CONCLUSION

For the reasons explained above, Defendant Hester-Jackson's motions to suppress, ECF No. 177, 181, 184, and the motion for early disclosure of Jencks materials and witness lists, ECF No. 178, are **DENIED**.

**SO ORDERED.**

Dated: December 30, 2025     s/Terrence G. Berg

HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE